# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BETTY BANNISTER, Individually and as Special Administrator of the Estate of Donald Bannister,<br><br>Plaintiff,<br><br>v.<br><br>JOHN CRANE, INC.;<br>3M COMPANY;<br>TYCO FIRE PRODUCTS LP;<br>CHEMGUARD, INC.;<br>E.I. DU PONT DE NEMOURS & CO.;<br>JOHNSON CONTROLS, INC.;<br>ANGUS INTERNATIONAL SAFETY GROUP, LTD.;<br>ANGUS FIRE ARMOUR CORPORATION;<br>CARRIER GLOBAL CORPORATION;<br>UNITED TECHNOLOGIES COMPANY;<br>KIDDE PLC INC.;<br>KIDDE-FENWAL FIRE FIGHTING, INC.;<br>SHELL U.S.A., INC.; and<br>R.J. REYNOLDS TOBACCO COMPANY,<br><br>Defendants. | Civil Action No. 3:26-cv-34<br><br>**NOTICE OF REMOVAL** |

Defendants Tyco Fire Products LP and Chemguard, Inc. (collectively "Tyco," except where identified individually by full name), by undersigned counsel, hereby give notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Circuit Court of the Third Judicial Circuit, Madison County, Illinois (the "State Court"), to the United States District Court for the Southern District of Illinois. As grounds for removal, Tyco alleges as follows on personal knowledge as to its own conduct and status and on information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.       Plaintiff seeks to hold Tyco and certain other Defendants liable based on their alleged conduct in manufacturing, selling, distributing, and/or supplying aqueous film-forming foam ("AFFF"). Specifically, Plaintiff alleges that Defendants' AFFF contained per- and polyfluoroalkyl substances ("PFAS") and that exposure to those substances caused her late husband, Donald Bannister, to develop various forms of cancer.

2.       Although the Complaint attributes Mr. Bannister's PFAS exposure to AFFF (and perhaps other products) that he allegedly was exposed to in the course of his work at the Wood River Refinery in Roxana, Illinois (the "Refinery"), he was also exposed to PFAS through his consumption of drinking water at various locations. And at least some of the PFAS in that drinking water was derived from military-grade AFFF ("MilSpec AFFF") manufactured by a select group of suppliers (including Tyco) in accordance with the military's rigorous specifications (the "MilSpec"). MilSpec AFFF-derived PFAS from drinking water was indistinguishably commingled in Mr. Bannister's body with PFAS from AFFF to which he allegedly he was exposed at the Refinery.[1] To the extent that Mr. Bannister's cancers were allegedly caused by PFAS, MilSpec AFFF-derived PFAS from drinking water caused or contributed to that disease process.

3.       As explained below, at relevant times the military specifications for MilSpec AFFF expressly *required* the product to contain PFAS. Under the federal "government contractor" defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), Tyco is immune to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product in compliance with military specifications. Tyco denies that PFAS from any source

---

[1] For purposes of this Notice, Tyco assumes without conceding that the Refinery did not use any MilSpec AFFF.

caused Mr. Bannister's alleged injuries. But to the extent that Plaintiff claims those alleged injuries arose from PFAS, Tyco intends to argue in the alternative that the government contractor defense applies because the injuries arose at least in part from MilSpec AFFF-derived PFAS. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), Tyco is entitled to remove this action in order to have its federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

4. It is irrelevant that Plaintiff's operative complaint does not expressly seek recovery for harms to Mr. Bannister caused by MilSpec AFFF-derived PFAS in drinking water. Because such PFAS was commingled in Mr. Bannister's body with any PFAS from alleged workplace sources, Plaintiff's request for relief necessarily encompasses damages caused by MilSpec AFFF-derived PFAS. Plaintiff cannot prevent Tyco "from raising the production of MilSpec AFFF as a defense or an alternate theory" of the Plaintiff's claimed damages. *Nessel v. Chemguard, Inc.*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021). Any effort in this litigation to ascertain whether and to what extent Mr. Bannister's injuries were caused by workplace sources of PFAS as opposed to MilSpec AFFF-derived PFAS will unavoidably involve a determination of the validity and scope of Tyco's government contractor defense, and such a determination must take place in federal court. *People ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 848-49 (7th Cir. 2024); *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 944-45 (7th Cir. 2020); *accord Maine v. 3M Co.*, 159 F.4th 129, 138-140 (1st Cir. 2025); *Maryland v. 3M Co.*, 130 F.4th 380, 388-92 (4th Cir. 2025).

## BACKGROUND

5. This action was filed on February 13, 2023, in the State Court, bearing Case No. 2023LA000191. The original Plaintiffs were Donald Bannister and his wife Betty. The Complaint alleged generally that Mr. Bannister was exposed to various chemicals—including PFAS contained in products supplied by Tyco—in the course of his work at the Refinery and that those exposures caused him to develop various forms of cancer. Mr. Bannister died in July 2024, and in March 2025 Mrs. Bannister, as the sole Plaintiff, filed a First Amended Complaint to reflect her status as Special Administrator of Mr. Bannister's estate. In July 2025, Plaintiff filed a Second Amended Complaint. In November 2025, she filed a Third Amended Complaint, currently the operative statement of Plaintiff's claims. That pleading asserts negligence claims against Tyco.

6. As required by 28 U.S.C. § 1446(a), Exhibit A to this Notice contains copies of all process, pleadings, and orders served upon Tyco in this action to date.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 93(c) and 1441(a) because the State Court is located within the Southern District of Illinois.

8. Tyco is not required to notify or obtain the consent of any other Defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); 28 U.S.C. § 1446(b)(2)(A) (consent required only for removals under 28 U.S.C. § 1441(a)).

9. Pursuant to 28 U.S.C. § 1446(d), Tyco is serving a copy of this Notice of Removal upon all other parties to this case and is also filing a copy with the Clerk of the State Court.

10. By filing a Notice of Removal in this matter, Tyco does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person,

or venue; and Tyco specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

11. Tyco reserves the right to amend or supplement this Notice of Removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1).

12. Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action "relating to" a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where (a) the removing defendant is a "person" within the meaning of the statute; (b) the defendant has "acted under" the United States, its agencies, or officers; (c) the action is "for or relating to" the defendant's acts under color of federal office; and (d) the defendant raises a colorable federal defense. *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018).

13. Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441(a). The "well-pleaded complaint" rule does not apply to removal under Section 1442(a)(1). *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012). Suits against defendants that have acted on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). That is so because Section 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (cleaned up). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, Section 1442 must be "liberally construe[d]" in favor of removal. *Betzner*, 910 F.3d at 1014.

14. All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the Plaintiff's claimed injuries, if caused by PFAS at all, were caused at least in part by MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard, Inc.*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against Tyco and other manufacturers of MilSpec AFFF); *Ayo v. 3M Co.*, 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (same). Since 2018, the Honorable Richard M. Gergel of the United States District Court for the District of South Carolina has been overseeing a multidistrict litigation proceeding (the "MDL") encompassing all cases in the federal system claiming injuries from AFFF. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.* (MDL No. 2873). The MDL court has found on multiple occasions that removal under § 1442(a)(1) is proper where the notice of removal alleges that plaintiff's alleged injuries have been caused, at least in part, by MilSpec AFFF. *See In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019) ("MDL Order 1"); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6. Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings clearly demonstrate that this case, too, has been properly removed to federal court.[2]

A. **MilSpec AFFF**

15. The United States Naval Research Laboratory developed AFFF in the 1960s to quickly suppress and extinguish liquid fuel fires, which are an ever-present risk in aviation and military environments. The military specification for MilSpec AFFF, MIL-F-24385, was first

---

[2] Following removal, Tyco intends to designate this action for transfer to the MDL.

promulgated in 1969, and has been subsequently revised a number of times.[3] Since the late 1960s, following catastrophic fires aboard the aircraft carriers USS *Forrestal* in 1967 and USS *Enterprise* in 1969, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to put out fires, save lives, protect property, and train its personnel. In addition, for many years the Federal Aviation Administration required MilSpec AFFF to be stocked and used to fight fires at larger civilian airports (so-called "Part 139" airports). MilSpec AFFF has also been used by some civilian fire departments. The Naval Research Laboratory has described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[4]

16. At all relevant times, the manufacture and sale of MilSpec AFFF were governed by rigorous military specifications created and administered by Naval Sea Systems Command, a unit of the Department of Defense ("DoD"). All MilSpec AFFF products were required to be qualified for listing on the applicable Qualified Products List prior to military procurement. Prior to such listing, a manufacturer's products were examined, tested, and approved to be in conformance with specification requirements.[5] The MilSpec designated Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfied the MilSpec's requirements. After a product was added to the Qualified Products List, "[c]riteria for retention of qualification [were] applied on a periodic basis to ensure continued integrity of the

---

[3] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[4] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[5] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

qualification status."[6] Naval Sea Systems Command reserved the right to perform any of the quality assurance inspections set forth in the specification where such inspections were deemed necessary to ensure that supplies and services conformed to prescribed requirements.

17. From its inception in 1969 until 2019, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS. In 2019 the MilSpec removed the express requirement of "fluorocarbon" surfactants, but the DoD acknowledged that no AFFF product can satisfy the stringent performance requirements of the MilSpec without the use of PFAS-containing surfactants.[7]

18. All MilSpec AFFF is military equipment and must be manufactured and labeled in accordance with military specifications, regardless of whether the product is ultimately used in a military or civilian setting.

    B.    **Mr. Bannister's Exposure to MilSpec AFFF-Derived PFAS**

19. The Third Amended Complaint alleges that Mr. Bannister was diagnosed with prostate cancer in 2005 and bladder cancer in 2013, and Plaintiff alleges that those cancers were caused by exposure to Tyco's AFFF products, among others. (Mr. Bannister was also diagnosed with skin cancer in 2013, but Plaintiff does not allege that Tyco's products caused that injury.)

20. During the relevant time periods, according to Plaintiff's responses to interrogatories, Mr. Bannister resided in the following locations:

- 1964-1976:  Grafton, Illinois
- 1976-1993:  Alton, Illinois
- 1993-2000:  Holiday Shores, Edwardsville, Illinois

---

[6] *Id.*

[7] *See* MIL-PRF-24385, § 6.6 (May 7, 2019), available at https://tinyurl.com/yxwotjpg.

- 2000-2011: Grafton, Illinois
- 2011-2014: Rio Hondo, Texas

When he lived at those locations, he consumed and was otherwise exposed to potable water supplied by the public water utilities for those municipalities.

21. The Alton, Illinois water system (now known as Illinois American-Alton) provides potable water to the residents of Alton and also sells water to the Grafton water system. PFAS, including perfluorooctanoic acid ("PFOA") and perfluorohexanoic acid ("PFHxA") have been detected in the water of the Alton water system, and such PFAS were present in the water that Mr. Bannister consumed when he resided in Grafton and Alton. The Alton water system draws its raw water from the Mississippi River. The watershed of the river upstream of Alton's water intake contains numerous military bases and Part 139 airports that used MilSpec AFFF, some of which entered the river. Those sites include the Rock Island Arsenal in Rock Island, Illinois, an Army facility; the Abraham Lincoln Capital Airport in Springfield, Illinois (where both civilian and military personnel, including members of the Illinois Air National Guard, used MilSpec AFFF); and the Quincy Regional Airport in Quincy, Illinois. Some of the PFAS in the Alton and Grafton water supply derives from MilSpec AFFF (including MilSpec AFFF manufactured by Tyco) used at such locations. Thus, Mr. Bannister was exposed to MilSpec AFFF-derived PFAS when he resided in Grafton and Alton.

22. Rio Hondo, Texas receives its potable water from the East Rio Hondo Water Supply Company ("ERHWSC"). PFAS, including PFOA and PFHxA, have been detected in the water of the ERHWSC, and such PFAS were present in the water that Mr. Bannister consumed when he resided in Rio Hondo. Those PFAS derive at least in part from the use and release of MilSpec AFFF (including MilSpec AFFF manufactured by Tyco) by both military and civilian personnel

9

at the Valley International Airport, a Part 139 airport where over 50% of operations involve military aircraft, as well as other military bases near the Rio Grande River upstream of the Rio Hondo area. Thus, Mr. Bannister was exposed to MilSpec AFFF-derived PFAS when he resided in Rio Hondo.

23. In addition to being exposed to MilSpec AFFF-derived PFAS by consuming drinking water at his residences, Mr. Bannister was also exposed to such PFAS by consuming potable water at the Refinery. The Refinery receives, and at relevant times received, its potable water from the Village of Roxana Water Department. PFAS, including perfluorooctanoic acid ("PFOA") and perfluorohexanoic acid ("PFHxA"), have been detected in the water of the Roxana water system, and such PFAS were present in the water that Mr. Bannister consumed when worked at the Refinery. The Roxana water system draws its raw water from groundwater wells. That water contains, and at relevant times contained, PFAS derived at least in part from the use and release of MilSpec AFFF (including MilSpec AFFF manufactured by Tyco) by both military and civilian personnel at the nearby St. Louis Regional Airport, a Part 139 airport with substantial military operations. Thus, Mr. Bannister was exposed to MilSpec AFFF-derived PFAS when he worked at the Refinery.

24. As the MDL Court has noted, the allegation that a plaintiff has been exposed to PFAS from MilSpec AFFF as well as other PFAS-containing products is "a theory that, if credited, holds sufficient water to substantiate federal officer removal." Case Management Order No. 36 at 2, ECF No. 7891, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-MN-2873 (D.S.C. Aug. 22, 2025) (cleaned up). "Accordingly and based on the MDL Court's knowledge and experience managing this MDL, the Court finds that there exists, at the very least, a plausible

10

basis for alleging federal jurisdiction sufficient to satisfy [defendants'] initial burden on a notice of removal." *Id.*

### C. All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.

#### 1. The "Person" Requirement Is Satisfied.

25. The first requirement for removal under the federal officer removal statute is satisfied here because Tyco Fire Products LP (a limited partnership) and Chemguard, Inc. (a corporation) meet the definition of "persons" under the statute. For purposes of § 1442(a)(1), the term "person" includes "corporations, companies, associations, firms, [and] partnerships." 1 U.S.C. § 1; *see Ruppel*, 701 F.3d at 1181.

#### 2. The "Acting Under" Requirement Is Satisfied.

26. The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147, 152 (2007). The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Ruppel* 701 F.3d at 1181. "'Acting under' covers situations . . . where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Id.* "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (emphasis in original).

27. The requirement of "acting under" a federal officer is met here because Mr. Bannister's alleged PFAS exposure stemmed in part from MilSpec AFFF, a vital product provided by Tyco that otherwise "the Government would have had to produce itself." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008); *see Ayo*, 2018 WL 4781145, at *9. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and

formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[8] Accordingly, the military has long depended upon outside contractors like Tyco to develop and supply MilSpec AFFF, and in doing so those contractors act under federal officers. In designing and manufacturing the MilSpec AFFF at issue, Tyco acted under the direction and control of one or more federal officers. Specifically, Tyco acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[9] Accordingly, in manufacturing and supplying MilSpec AFFF, Tyco acted under federal officers within the meaning of Section 1442(a)(1). *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5 (holding likewise in case involving MilSpec AFFF used at Part 139 airport); MDL Order 3, at 3–6 (same).

                  **3.**     *The "For or Relating to" Requirement Is Satisfied.*

28. The third requirement, that the lawsuit is one "for or relating to" the defendant's actions taken under color of federal office, is satisfied when there is a "connection or association" between the lawsuit and the defendant's actions under federal authority. *Baker*, 962 F.3d at 943.

---

[8] Fulfilling the Roosevelts' Vision, *supra* n.3, at 37.

[9] *See* Dep't of Defense, SD-6, *supra* n.5, at 1.

As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. In assessing whether there is a connection between the lawsuit and the defendant's actions under federal authority, a court must credit the defendant's "theory of the case." *Acker*, 527 U.S. at 432. The required connection may arise from a defense to plaintiff's claims. *See Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present").

29. Here, Plaintiff alleges that the use of PFAS in Tyco AFFF caused Mr. Bannister's alleged injuries. Tyco contends that some of the PFAS giving rise to those alleged injuries derived from MilSpec AFFF, and that the use of PFAS in MilSpec AFFF was required by military specifications. As a result, Plaintiff's claims against Tyco are connected to its acts taken under color of federal office. *See Maine*, 159 F.4th at 138-39; *Maryland*, 130 F.4th at 390-91; *Baker*, 962 F.3d at 945; *Nessel*, 2021 WL 744683, at *3.

### 4. The "Colorable Federal Defense" Requirement Is Satisfied.

30. The fourth requirement ("colorable federal defense") is satisfied by Tyco's assertion of the government contractor defense.

31. At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (cleaned up). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (cleaned up)). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*

*v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014); *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (cleaned up). The defendant's "jurisdictional allegations control unless it is legally impossible for them to be true." *Betzner*, 910 F.3d at 1014 (cleaned up).

32. Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. Tyco has satisfied these elements for purposes of removal.

33. The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling. Those specifications are "reasonably precise" in requiring the use of PFAS. As noted above, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are PFAS. Even since that express requirement was removed from the specification, the use of PFAS has been

implicitly mandated because PFAS-containing surfactants are the only kind that allow AFFF to meet the performance requirements of the specification. In addition, the DoD purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of [PFAS]-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

34. With respect to the second requirement, Tyco's MilSpec AFFF products appeared on the DoD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See id.* at *13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

35. Regarding the third requirement, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues. For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from

firefighting exercises are considered to have adverse effects environmentally."[10]  By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."  In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.  More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFAS.  Nonetheless, it still described AFFF containing PFAS as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[11]  Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS will be present in AFFF formulations.  If the government is already aware of the relevant product hazards, no warning by the manufacturer to the government is required.  *See Ayo*, 2018 WL 4781145, at *14; MDL Order 1, 2019 WL 2807266, at *3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

36.     At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks.  *See Twinam v. Dow Chem. Co.*

---

[10] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[11] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

(*In re "Agent Orange" Prod. Liab. Litig.*), 517 F.3d 76, 90 (2d Cir. 2008). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

37. Tyco's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on Tyco for alleged injuries to Mr. Bannister that were caused in whole or in part by Tyco's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

38. The MDL court has found based on an extensive factual record that the government contractor defense asserted by Tyco and other MilSpec AFFF manufacturers presents genuine issues of fact for trial. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is by definition better than merely "colorable."

39. To the extent that Mr. Bannister was exposed to PFAS derived from any non-MilSpec AFFF, MilSpec AFFF nevertheless inseparably contributed to any alleged PFAS exposure that he experienced, and the government contractor defense is necessarily implicated regardless of the type of AFFF that Plaintiff may identify as the source of Mr. Bannister's alleged injuries.

**D.    This Notice of Removal Is Timely.**

40. 28 U.S.C. § 1446 sets forth two different 30-day time limits for removal. *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 823 (7th Cir. 2013). "The first applies to cases that are removable based on the initial pleading." *Id.* In that situation, the notice of removal "shall be filed within 30 days after the receipt by the defendant . . . of a copy of the initial pleading setting forth the claim for relief." 28 U.S.C. § 1446(b)(1). "[I]f the case stated by the initial pleading is not

removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." *Id.* § 1446(b)(3). In either situation, "the 30–day removal clock does not begin to run until the defendant receives a pleading or other paper that *affirmatively and unambiguously* reveals that the predicates for removal are present." *Walker*, 727 F.3d at 824 (emphasis added). The timeliness of removal does not depend at all on what "the defendant subjectively knew or should have discovered through independent investigation" about the factual grounds for removal. *Id.* at 825. "[W]hat a defendant might have discovered by following up on clues or suggestions that federal jurisdiction may exist is irrelevant to the timeliness inquiry." *Ayotte v. Boeing Co.*, 316 F. Supp. 3d 1066, 1075 (N.D. Ill. 2018) (cleaned up) (rejecting untimeliness objection to notice of removal under Section 1442(a)(1)). Rather, "the timeliness inquiry is limited to examining contents of the clock-triggering pleading or other litigation paper; the question is whether that document, on its face or in combination with earlier-filed pleadings, provides specific and unambiguous notice that the case satisfies federal jurisdictional requirements and therefore is removable." *Walker*, 727 F.3d at 825.

41. This Notice of Removal is timely. Neither the original Complaint in this action, nor the subsequent amended complaints, nor any other "litigation paper" received by Tyco has suggested—much less provided "specific and unambiguous notice"—that Mr. Bannister was exposed to MilSpec AFFF-derived PFAS from drinking water or other sources. That Tyco has now made allegations supporting the removal of this action does not mean it was required to remove the case at an earlier time. A defendant's ability to make allegations supporting removal based on the totality of available information and the triggering of the 30-day deadline "are not two sides of the same coin." *Walker*, 727 F.3d at 824. Put another way, "a defendant *may* remove

before it *must* do so." *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1094 (9th Cir. 2021) (emphasis in original).

WHEREFORE, Tyco hereby removes this action from the Circuit Court of the Third Judicial Circuit, Madison County, Illinois, to this Court.

                                                                                        Respectfully submitted,

Dated: January 13, 2026                      */s/Laura K. Beasley*
                                                      Laura K. Beasley, #6274537
                                                      Baker Sterchi Cowden & Rice LLC
                                                      23 Public Square Suite 400
                                                      Belleville, Illinois 62220
                                                      Telephone: 618-202-5800
                                                      Facsimile: 618-257-2678
                                                      lbeasley@bakersterchi.com

                                                      *Attorney for Defendants Tyco Fire Products LP and Chemguard, Inc.*

## CERTIFICATE OF SERVICE

I, Laura K. Beasley, hereby certify that on January 13, 2026, I caused a true and correct copy of the foregoing document to be filed via the Court's Electronic Case Filing (ECF) system, which will send a notification to all counsel of record, and paper copies will be sent to those indicated as non-registered participants on this date as follows:

Via Electronic Mail (courtesy copies):

Ted N. Gianaris,
Joshua A. Edelson
Gianaris Trial Lawyers,
1 Design Mesa
Collinsville, Illinois 62002
618.619.0010
(618) 259-2251 (Fax)
tgianaris@lawforpeople.com
jedelson@lawforpeople.com


Dated: January 13, 2026                              /s/Laura K. Beasley